# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     Case No. 15-CR-241

ASHLEY E. KITCHENAKOW,

        Defendant.

## DECISION GRANTING IN PART AND DENYING IN PART
## MOTION TO SUPPRESS

      Defendant Ashley E. Kitchenakow is charged in an indictment with involuntary manslaughter in causing the death of an individual whose initials are S.A. while driving a motor vehicle under the influence of an intoxicant on the Menominee Indian Reservation in violation of 18 U.S.C. §§ 1112 and 1153. In a second count, Kitchenakow is charged with assault resulting in serious bodily injury to a person whose initials are J.R., arising out of the same occurrence in violation of 18 U.S.C. §§ 113(a)(6) and 1153. The first count carries a maximum sentence of eight years in prison, while the second count, curiously, carries up to ten years. The case is before the Court on the defendant's motion to suppress evidence allegedly obtained as a result of an illegal arrest of the defendant in violation of the Fourth Amendment and the violation of her Fifth Amendment right against compelled self-incrimination. For the reasons set forth below, the motion will be denied in part and granted in part.

## I.      THE ARREST OF THE DEFENDANT WAS LAWFUL.

      Defendant first contends that law enforcement illegally entered her home to effectuate her arrest, and thus, any evidence obtained as a result of the arrest must be suppressed. Specifically,

defendant seeks suppression of the test results for the alcohol content of her blood, her field sobriety test results, and any statements made to the Menominee Tribal Police or the FBI, as well as any derivative evidence. I conclude, however, that the arrest of the defendant by Menominee Tribal Police Officer Vincent Grignon was not illegal.

At the evidentiary hearing held on the defendant's motion, Officer Grignon testified that at approximately 11:00 p.m. on August 29, 2015, he was requested to assist an investigation of an automobile accident in Neopit, Wisconsin on the Menominee Indian Reservation. Upon his arrival, Officer Grignon noted that a vehicle had crashed into a tree. The vehicle was badly damaged, but was unoccupied at the time. The registration of the vehicle came back to the defendant, and several witnesses at the scene had told other officers that she had fled the scene.

Officer Grignon had known the defendant since they were in high school together. He also knew where she lived. He proceeded to that location in his squad car and arrived shortly thereafter. He observed that there were people in the back yard, sitting around a fire. Officer Grignon asked if the defendant was present and was told that she had left a couple of hours earlier. He asked if she was in the house and was told by an individual who was later identified as Christopher Kitchenakow that she was not. Officer Grignon then asked if he could go inside to look for himself. Christopher consented, but when Officer Grignon asked if he had authority to consent, Christopher admitted that he did not. Christopher stated, however, that the defendant's father was inside and that he did have such authority. Officer Grignon then knocked on the door and was invited to enter by the defendant's father. The defendant was not there.

In the meantime, the dispatcher for the Menominee Tribal Police advised Officer Grignon that there were active warrants on Christopher Kitchenakow. Officer Grignon took Christopher into

2

custody and transported him to the Menominee Tribal Police Department. He was then directed back to the scene at which time he was informed that one of the occupants of the vehicle had died and others were seriously injured. When he arrived back at the scene, he observed a woman down the street screaming that the defendant was running down the alley. Officer Grignon proceeded to the location of the woman and she stated that the defendant was running down River Street. Officer Grignon gave chase and followed the defendant back to her home. An occupant of the home across the street pointed to her home and indicated that she had entered just before Officer Grignon arrived. Officer Grignon then proceeded to the back of the house again, knocked on the door, and heard the defendant respond. When she opened the door, Officer Grignon instructed her to exit the residence. She did not comply and he reached in, grabbed her arm and pulled her out. At that point, he advised her she was being detained and placed restraints on her wrists. She was then transported to Shawano Medical Center where she failed the sobriety tests and consented to the withdrawal of a sample of her blood for testing. According to the government, the test showed an alcohol content of .154 %. Gov't. Resp. to Mot. to Suppress (ECF No. 12) at 4.

Officer Grignon testified that he did not step into the house when he grabbed the defendant; he simply reached in and pulled her out. He further stated that she was within one step of the entrance. Further, he testified that he did not want her to retreat into the home because there were other individuals there and that on his earlier entry he had seen alcohol. In his experience, it is not uncommon for someone who is suspected of driving under the influence, if given the chance, to rapidly drink, or chug, additional alcoholic beverages so as to make impossible an accurate determination of their blood alcohol content at the time they were driving. For all of these reasons, he concluded that taking custody of the defendant when she appeared at the doorway was

3

reasonable.

Officer Grignon was correct. Under the "hot pursuit" exception to the search warrant requirement a law enforcement officer may enter a home while in "hot pursuit" of a suspect in order to protect the public or prevent the destruction or loss of evidence of a crime. *Warden v. Hayden*, 387 U.S. 294 (1967); *United States v. Santana*, 427 U.S. 38 (1976). In *Santana*, the defendant was suspected of selling heroin to an undercover police officer. Within minutes of the sale, other police officers proceeded to the home and observed the defendant standing in the doorway of the house where the delivery had just occurred. The police pulled up to within 15 feet of the defendant, got out of their van shouting "police" and displaying their identification. As the officers approached, the defendant retreated into the vestibule for her house. The officers followed through the open door, catching her in the vestibule. As she tried to pull away, a bag she was holding tilted and two bundles of paper package with white powder, later determine to be heroin, fell to the floor. She was later arrested and charged with possession of heroin with the intent to distribute. In upholding the arrest and seizure of evidence the Court noted that the police were justified in entering the home in hot pursuit of the defendant and given the exigent circumstances. Exigent circumstances existed because once the defendant saw the police, there was a realistic expectation that any delay would result in the destruction of evidence. *Id.* at 42–3.

The same reasoning justifies the actions of Officer Grignon in this case. The defendant had fled the scene of the fatal accident approximately two hours and forty minutes earlier. It was reasonable to believe she had been hiding and running from the police since that time. She entered the house only minutes before Officer Grignon arrived. If he had not immediately taken the defendant into custody at the doorway, Officer Grignon risked the possibility that the defendant

4

would flee into the house and delay even further the opportunity to obtain a sample of her blood so that it could be tested for its alcohol content. Officer Grignon noted that he was aware from his training and experience that alcohol metabolizes in the blood and the longer the delay between the drinking and the driving, the more difficult it would be to prove that she was intoxicated at the time of the crash. Officer Grignon also noted the additional risk that if not immediately taken into custody, the defendant would be able to consume additional alcoholic beverages that were accessible to her in the house so as to make impossible the determination of what her blood alcohol content was at the time she was driving.

Under these circumstances, the limited entry required in order for Officer Grignon to take the defendant into custody was reasonable. It is important to note that other than reaching across the threshold, Officer Grignon did not enter the defendant's home; he simply reached in and pulled the defendant out onto the porch. The defendant suggests that because the arrest occurred at the back door, the invasion of the defendant had a greater privacy interest than if Officer Grignon had gone to the front door. But Officer Grignon explained that the back door was commonly used as the entrance to the home for guests, and the defendant offered no evidence that visitors were not welcome to come to the back door in order to summon one of the occupants. Finally, it should also be noted that police were investigating a homicide. This was not a mere driving while intoxicated offense. *Cf. Welsh v. Wisconsin*, 466 U.S. 470 (1984) (holding that warrantless "hot pursuit" entry into home to arrest occupant for driving under the influence prohibited by Fourth Amendment). Based on the totality of circumstances, I conclude that Officer Grignon's arrest of the defendant was reasonable. The defendant's motion to suppress for violation of her rights under the Fourth Amendment is therefore denied.

5

## II. THE STATEMENTS KITCHENAKOW MADE TO POLICE IN THE EARLY MORNING OF AUGUST 29 WERE NOT OBTAINED IN VIOLATION OF HER RIGHTS.

The defendant also challenges the admissibility of several statements she made following her arrest before her transport to the hospital, at the hospital, and during various interviews at the tribal jail. The statements themselves were recorded and were copied to two separate discs that were received into evidence as Exhibits 12 and 13. Exhibit 12 contains video and audio recordings from Officer Grignon's personal body camera, and Exhibit 13 contains audio recordings made by F.B.I. Special Agent Lynch during his interactions with the defendant. Officer Grignon explained that his body camera was difficult to activate and would go off on occasion without notice. Both discs contain multiple recordings and there is some overlap when both Officer Grignon and S.A. Lynch were with the defendant at the Shawano Medical Center. The Government has also submitted transcripts of the recordings that S.A. Lynch made. (ECF No. 15-1 to 15-4.) The facts that follow are based on the testimony, the recordings and the transcripts.

As to the statements she made while being transported to the hospital, at the hospital, and in response to the questions contained in the Alcohol Influence Report, the defendant alleges that her state of intoxication at the time rendered her statements involuntary and that confusion existed over her *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The confusion over *Miranda* rights allegedly arose when Officer Grignon initially advised the defendant of her right to remain silent and of her right to have an attorney present during questioning. Instead of advising the defendant that an attorney would be appointed for her at public expense if she could not afford to hire one on her own as *Miranda* requires, Officer Grignon told the defendant that she had the right to an attorney at her own expense. This would have been correct if the defendant was facing only

6

a tribal charge of driving while intoxicated (OWI) with a maximum penalty of no more than a year. 25 U.S.C. § 1302(c)(2). But because the defendant was facing charges of manslaughter and assault causing serious bodily injury, each of which carry penalties substantially in excess of one year, the defendant was entitled to counsel at public expense if she could not afford to retain an attorney on her own. Thus, Officer Grignon's initial recitation of the defendant's right to counsel was incorrect. Fortunately, Officer Grignon corrected this mistake at the hospital after he had her perform the field sobriety tests.

After she completed the field sobriety tests, Officer Grignon completed an Alcohol/Drug Incidence Report, a form created by the Wisconsin Department of Transportation for use with OWI arrests. The form contains a complete and accurate statement of the *Miranda* warnings, including the right to have counsel appointed without charge prior to questioning. Ex. 7. Officer Grignon testified he read the statement of rights to the defendant and she acknowledged she understood them, agreed to answer questions and signed the waiver, which according to the form, was at 4:07 a.m. He then proceeded to ask her the questions in the printed form and recorded as accurately as he could her responses, including her denial that she had been involved in a crash.

Both before and after Officer Grignon read the defendant her *Miranda* rights from the Alcohol/Drug Influence Report, the defendant made a number of statements that were not in response to any questions put to her by law enforcement. She denied that she had been driving her car that night and claimed that she "borrowed it out" to others. The defendant contends that these statements are inadmissible because Officer Grignon misstated the *Miranda* warnings and because her intoxication rendered them involuntary. Neither reason warrants suppression of all of her statements.

*Miranda* warnings need not be given in the exact form described in the decision that gave them their name. *Duckworth v. Egan,* 492 U.S. 195, 202–03 (1989). The inquiry is whether the warnings given convey the rights required by the *Miranda* decision. *Id.* at 203. In this case, it appears that Officer Grignon initially misstated one of the key rights *Miranda* requires law enforcement to convey to a suspect before he or she can be subjected to custodial interrogation: the right to have an attorney appointed at public expense if she cannot afford to retain one on her own. *Miranda*, 384 U.S. at 472–73. To the extent Officer Grignon questioned the defendant before he correctly administered the warnings, her answers to his questions cannot be used as evidence against her.

The defendant contends that Officer Grignon questioned her before he properly advised her of her rights. She contends that he asked, "Was anyone under 16 in the vehicle you're aware of?" She states she eventually replied saying "I borrowed my car out last night and I remember I was sitting by the back fire and whatever, and I borrowed my car out to a whole group of fuckin' girls and they took my fuckin' car." Def.'s Br. in Supp. (ECF No. 16) at 12. In fact, the video recording shows that the defendant is the one who was interrogating Officer Grignon, as well as the Chief of the Menominee Tribal Police, both of whom she knew on a first-name basis. The question referenced by the defense was actually asked of one of the investigating officers, not the defendant. Following her arrest on suspicion of operating while intoxicated and on several outstanding warrants, the defendant repeatedly asked, "What did I do?" A trooper with the state patrol appeared and asked the defendant if she was injured. She responded "I wasn't driving so I wasn't hurt" and that she had loaned her car out. She denied she had been driving several times.

8

Asking a woman who is believed to have been in a serious automobile accident if she is injured prior to fully advising her of her rights is not a violation of *Miranda*. It falls well within the public safety exception to *Miranda* recognized by the Court in *New York v. Quarles*, 467 U.S. 649 (1984). In *Quarles*, police apprehended an allegedly armed rape suspect in a super market, but not before he disappeared down an aisle. Upon apprehending the suspect, one of the officers noticed that he was wearing an empty shoulder holster and asked him where the gun was. The suspect nodded in the direction of some cartons from one of which the officer retrieved a loaded .38-caliber revolver. Notwithstanding the fact that the officers did not *Mirandize* the suspect before asking him where the gun was, the Court held that the statement was admissible at his trial. The Court held that the facts of the case presented "a situation where concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in *Miranda*." *Id.* at 653. The Court further held that "the availability of that exception does not depend upon the motivation of the individual officers involved." *Id.* at 656. "Whatever the motivation of individual officers in such a situation," the Court held, "we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* Though the concern here was with the defendant's personal safety, the same rationale applies. Under the circumstances inquiring about the defendant's own safety, especially since she was pregnant, outweighed adherence to the literal language of *Miranda*. Thus, to the extent the defendant's statements followed the State trooper's question of whether she was injured, they would fall within the public safety exception.

In fact, the defendant's repeated statement that she was not driving that night, but had loaned her car out to others, was not in response to any questioning by law enforcement but instead was

Case 1:15-cr-00241-WCG   Filed 03/02/16   Page 9 of 21   Document 18

volunteered by the defendant in an effort to assert a defense to the charge that she was driving while intoxicated. Statements that are not in response to questioning but are volunteered by a suspect are not subject to the requirements of *Miranda*. 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."). Thus, with respect to the defendant's repeated statements that were made voluntarily and not in response to questions posed by law enforcement, the fact that Officer Grignon initially failed to fully convey the required warnings is irrelevant.

The fact that the defendant was under the influence of alcohol is likewise not grounds for suppressing her statements. The defendant contends that her intoxication rendered her statements involuntary and thus inadmissible under the Fourteenth Amendment. For a defendant's confession to be involuntary within the meaning of the Due Process Clause of the Fourteenth Amendment, however, there must be a showing of coercive police activity. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). The evidence in this case shows that Officer Grignon did not engage in any coercive activity to elicit the defendant's statements. He did not question her on the way to the hospital. Upon their arrival at the hospital, Officer Grignon conducted several field sobriety tests, each of which she failed. These are the kinds of tests the Court has held may be administered prior to the administration of *Miranda* warnings, since the evidence they seek to elicit is not testimonial. *Pennsylvania v. Muniz*, 496 U.S. 582, 603–04 (1990).

There were a couple of questions that Officer Grignon asked the defendant in the course of conducting the field sobriety tests that do constitute custodial interrogation, however. He asked her if she had been in a crash, to which she responded "no." The question was clearly intended to determine whether there were reasons other than alcohol intoxication that would account for any

10

difficulty the defendant experienced in performing the field tests. Given the defendant's previous volunteered statements that she was not driving her car that night and the non-incriminating character of her response, it serves little purpose to exclude her answer. But to avoid any possibility of error, I conclude that her response should be suppressed. *See Muniz*, 496 U.S. at 592–93 (holding that asking drunk-driving suspect the date on which he turned six testimonial). While performing the field sobriety tests, Officer Grignon also asked the defendant how much and what she had been drinking that night, and when she had stopped drinking. These questions were clearly intended to elicit testimonial evidence. Given the defective *Miranda* warnings he administered at the scene, the defendant's responses to these questions must be suppressed.

At 3:06 a.m., after the field sobriety tests were completed, Officer Grignon went over the "Informing The Accused" form with the defendant, and she consented to a chemical test of her blood. Ex. 6. Officer Grignon thereafter went over the Alcohol/Drug Influence Report with the defendant. She then waived her *Miranda* rights after they were fully explained to her. Again, the time she signed the waiver was 4:06 a.m. Ex. 7. The answers she gave and that Officer Grignon wrote down in response to the question in the form were not the product of police coercion and are therefore admissible. Though several of the questions on the form were identical to those Officer Grignon had asked the defendant while administering the field sobriety tests and prior to his fully advising her of her rights (such as what she had been drinking, when, how much, and whether she had been in a crash), the failure to fully administer the required warnings earlier does not require the suppression of her responses. In *Oregon v. Elstad*, the Court held that it would be "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his

free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." 470 U.S. 298, 309 (1985). The Court held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.*

Here, I find that the defendant knowingly and voluntarily waived her *Miranda* rights and responded to Officer Grignon's questions about whether she had been in a crash that evening, and what and when she had been drinking. It is clear from listening to the recordings that the defendant was not coerced or intimidated by the law enforcement officers she dealt with that evening. Ex. 12. She had known Officer Grignon since high school and called him, another tribal officer, and the Chief by their first names. She repeatedly asked them to explain what was going on, and even after they told her she was under arrest for suspicion of operating while intoxicated and on several outstanding warrants, she continued to press them for information. Her position, stated throughout her interaction with law enforcement, was that she was not driving at the time of the accident and that she had loaned her car to others. Though she was intoxicated, she clearly understood her situation, and Officer Grignon took no steps to exploit or take advantage of her. Finally, it is important to note that Officer Grignon did in fact advise the defendant of her rights at the time he arrested her. His failure to explain that her right to an attorney included the right to one provided at no cost to her if she could not afford to hire one was inadvertent. *Compare Missouri v. Siebert*, 542 U.S. 600 (20004) (holding that where police undertake strategy designed to undermine *Miranda* warnings by conducting a two-phase custodial interrogation, the first without warnings followed immediately by a second preceded by the required warnings, all statements inadmissible). Under these

circumstances, I conclude that *Elstad* applies and that the defendant's responses on the Alcohol/Drug Influence Report are admissible.

This leaves the statements the defendant made to Special Agent Patrick Lynch of the FBI in the early morning hours of August 29. S.A. Lynch introduced himself to the defendant at approximately 2:43 a.m. Ex. 12. Shortly after he arrived, S.A. Lynch made the determination that he would not interview the defendant until after she was sober. He informed the defendant that she was facing federal charges arising out of her driving under the influence and that he planned to wait until the alcohol had passed through her system before questioning her. Despite S.A. Lynch's insistence that he did not want to ask her any questions at that time, the defendant repeatedly stated that she had not been driving her car the preceding evening. She stated she was drinking beer around the fire in her back yard and had loaned her car to a group of girls. These statements were volunteered by the defendant and were not in response to questions put to her by law enforcement. Accordingly, they are admissible.

## III.     THE DEFENDANT INVOKED HER RIGHT TO COUNSEL ON AUGUST 29 AND THE SUBSEQUENT WAIVER ON SEPTEMBER 1 WAS INVALID.

Later that day at approximately 1:40 p.m., S.A. Lynch met with the defendant at the Menominee Tribal Jail along with Detective Dave Mahkimetas for the purpose of interviewing her about the events of the previous evening. Ex. 13. After explaining the purpose of their meeting and reintroducing himself, S.A. Lynch had the defendant read and initial each of the rights listed in the FBI's Advice of Rights form. Ex. 8. He then instructed her that the next section of the form is called a waiver and states that she is willing to talk to law enforcement now without a lawyer present. At that point, the defendant responded: "I don't know what's going on first. I'd want,

13

would like to speak to a lawyer first, I guess, before anything cuz I don't know what's going on." S.A. Lynch interrupted the defendant in the course of her response, saying he would explain what was going on. The defendant then stated: "I mean, do I need a lawyer? That's, that's the question." S.A. Lynch responded that it was "certainly up to you" but offered to explain to her why they were there and to give her the information. Ex. 13, (ECF No. 15-2 at 3.)

The defendant contends that at that point, she invoked her right to counsel and the interview should have been terminated. It is true that when a suspect invokes her right to counsel, her request must be honored and all questioning must cease. *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). But in order to invoke the right to counsel, "the suspect must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). "It is not enough that the suspect might be invoking the right to counsel; rather, the suspect must do so unambiguously." *United States v. Peters*, 435 F.3d 746, 751 (7th Cir. 2006). Here, I conclude that the defendant's initial statement was not an unequivocal invocation of her right to counsel. The use of the phrase "I guess" followed immediately by the statement "I mean, do I need a lawyer? That's the question," indicate uncertainty and equivocation. Thus, it was not improper to continue the conversation. What happened next, however, is more problematic.

At that point, S.A. Lynch told the defendant that she was driving her vehicle the previous evening, an accident occurred, one passenger was killed, and several other passengers were injured, one quite seriously. According to S.A. Lynch, several people came out of their residence when the accident occurred and began taking pictures. Everybody that was interviewed identified the defendant as the driver. Others saw her running from the scene. Because someone died, S.A. Lynch told the defendant the federal prosecutor would be involved and the case would go to federal court.

14

S.A. Lynch told the defendant that he was talking to her "to give you the opportunity to help yourself." (*Id.* at 5.)

S.A. Lynch then proceeded to explain to the defendant the way the federal sentencing guidelines worked. He explained that an offense level would be calculated and that if a defendant accepted responsibility for her crime, the offense level would be reduced by three levels. This was important, S.A. Lynch explained, because "if they accept responsibility, the offense level is lowered and that has a determinating [sic] eh, determining factor on what your sentence is gonna be." (*Id.*) S.A. Lynch assured the defendant that she would be convicted in federal court and it was just a question of what her sentence would be. "Do you want some relief in your sentence? Are you gonna get a reduction in sentence for cooperating and acceptance of responsibility? Or are you gonna continue to lie about this and say that 'I loaned my vehicle out.'" (*Id.*)

Later in the interview, S.A. Lynch showed the defendant a copy of the Sentencing Table from the United States Sentencing Commission Guidelines Manual and explained what a three-level reduction in her offense severity score might look like. (*Id.* at 8.) Though he was unsure what the base level would be for vehicular homicide, S.A. Lynch explained that it could be significant: "So you're cutting almost 2 ½ years, potentially by accepting responsibility." (*Id.* at 9.) The defendant responded several times to the questions S.A. Lynch said he intended to ask her, stating that she honestly did not know if she was the driver. She claimed that the last thing she remembered was giving her keys to Autumn. (*Id.* at 5–6, 10.) S.A. Lynch then told her "if you don't know, then what we'll do is ask you questions and account for your time." (*Id.* at 10.) But if she chose not to talk with them, S.A. Lynch explained, "then we'll just go on and then we'll conduct our investigation and then, and then you'll be convicted and then you won't get a reduction in your sentence. You

won't get acceptance of responsibility." (*Id.* at 11.)

Despite S.A. Lynch's explanation, the defendant eventually invoked her right to counsel. She asked "So, I can have a lawyer though? Of what's really going on? Somebody that can talk to me about legal advice and ....." (*Id.* at 16.) S.A. Lynch responded "Absolutely. You have that right." (*Id.*) Referring to the sentencing guidelines again, S.A. Lynch even told the defendant "you can get the three back, ... if you accept responsibility, you'll get, you can get the reduction." (*Id.* at 17.) After some further conversation about contacting an attorney, the interview ended, and the defendant was returned to the tribal jail.

The following day, S.A. Lynch and Officer Mahkimetas again met with the defendant at the Menominee Tribal Police Department. This time, she was accompanied by Kenneth Fish, the defendant's non-lawyer tribal advocate. Tribal advocates are utilized to represent tribal members in tribal courts. Fish was an employee of the Menominee Tribal Court. He received some legal training via a mentorship with the Menominee Tribe and through a program run by Judicare, a nonprofit organization that provides legal services for the poor. He was not licensed to practice law, however, and had no experience in federal or state court.

Once a suspect invokes her rights under *Miranda*, the general rule is that law enforcement may not resume questioning the suspect unless she or her attorney institutes further contact. *Edwards*, 451 U.S. at 484–85. S.A. Lynch testified that it was his understanding that Fish had contacted a tribal detective and told him the defendant wanted to speak with them. Fish, however, testified that he was told by tribal authorities that they wanted to speak with the defendant and he asked to be present. This is not enough to show that the defendant initiated further contact with law enforcement. For this reason alone, the defendant's September 1 statements to law enforcement are

16

not admissible as part of the government's case in chief. But there is an additional reason: the defendant's waiver of her *Miranda* rights was not valid.

In order to be valid, a suspect's waiver of rights under *Miranda* must be voluntary. *Connelly*, 479 U.S. at 169. The test for voluntariness of a suspect's waiver of *Miranda* is the same as the test for determining whether a statement is voluntary within the meaning of the Fourteenth Amendment, i.e., free of government coercion. *Id.* "Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him." *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009). "[A]n empty prosecutorial promise could prevent a suspect from making a rational choice by 'distorting the alternatives among which the person under interrogation is being asked to choose.'" *Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir. 1996) (quoting *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir. 1989)). In *United States v. Anderson*, for example, the supervising special agent for the Drug Enforcement Administration told a suspect arrested in a drug investigation "if he asked for an attorney, no federal agents would be able to speak to him further; the agent added 'this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us.'" 929 F.2d 96, 97 (2d Cir. 1991). The court noted that "[t]he 'if you want a lawyer you can't cooperate' language was repeated three times," after which the suspect made several incriminating statements admitting he was a "small time" drug dealer working with a larger dealer. *Id.* In affirming the district court's decision granting the motion to suppress the defendant's confession, the Second Circuit concluded that the DEA agents statements were false and/or misleading:

17

> It is commonplace for defendants who have acquired counsel to meet with federal law enforcement officials and agree to cooperate with the government. The Guidelines explicitly provide for this procedure and, upon the government's motion, give a sentencing court authority to depart below mandatory statutory minimum sentences where such cooperation is deemed substantial. See Guidelines § 5K1.1 and application note 1.

*Id.* at 100. The court went on to hold that "the agent's statements ruled out that possibility, and may have created in Anderson's mind a false sense that he must confess at that moment or forfeit forever any future benefit that he might derive from cooperating with the police agents." *Id.* These kinds of misleading statements, the court held, pose a serious constitutional problem and may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege. *Id.*

It is likewise commonplace for defendants to receive downward adjustments in their offense severity score for acceptance of responsibility even though they invoked their right to counsel when questioned by police. The application notes to the Guidelines make clear that acceptance of responsibility before trial is generally sufficient to warrant the three-level reduction that S.A. Lynch referenced. U.S.S.G. §3E1.1 and application note 3. Moreover, since *United States v. Booker*, 543 U.S. 220 (2005), it is no longer the case that the offense severity score, along with the offender's criminal history category, are "determining factors" of the sentence that will be imposed. Thus, S.A. Lynch's representation that the defendant would receive a higher offense severity score, and thus a longer sentence, if she invoked her right to have an attorney during questioning was at least misleading if not false.

This is not to say that a promise to speak to the prosecutor if the suspect cooperates would be improper. *See, e.g., United States v. Villalpando*, 588 F.3d 1124 (7th Cir. 2009) (holding that promise to use influence on district attorney to offer leniency did not render confession involuntary);

18

*United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007) (same). Likewise, there is nothing wrong with a law enforcement officer noting in general that immediate expressions of remorse and prompt acceptance of responsibility can result in shorter sentences. But when law enforcement officers venture into advising suspects of the law and the complex world of sentencing guideline determinations, dangers arise. That is what occurred here. There is no reason to believe that S.A. Lynch was not sincere and honest in his effort to explain to the defendant why it was in her interest to waive her rights and answer law enforcement's questions before talking with an attorney. It is true that acceptance of responsibility reduces a defendant's offense severity score. The problem was that S.A. Lynch's explanation of the process would lead a reasonable person to believe that one could only receive the benefit of a reduction in their offense severity score and thus a lower sentence by waiving one's rights and immediately confessing to police. That is not how the guidelines work.

The Seventh Circuit has noted that it treats false promises differently than other somewhat deceptive police tactics (such as cajoling or duplicity) because "a false promise has the unique potential to make a decision to speak irrational and the resulting confession unreliable." *Villalpando*, 588 F.3d at 1128. In this case, for instance, S.A. Lynch told the defendant that her conviction was a foregone conclusion based on the evidence law enforcement had obtained and the only way she could help herself was admitting that she was driving at the time of the crash. In other words, if what S.A. Lynch said was true, then it was rational for the defendant to waive her rights and admit that she was driving whether she remembered doing so or not. The danger was enhanced by the fact that S.A. Lynch purported to explain in great detail that he was not just making a promise to the defendant but explaining to her the law. S.A. Lynch's mistaken view of the law tainted any decision the defendant would have made at the time.

19

Had the defendant spoken to counsel before resuming her interview with S.A. Lynch and Officer Mahkimetas, the taint created by S.A. Lynch's suggestion that the defendant could only reduce her sentence by waiving her rights and answering law enforcement's questions without an attorney could have been cured. But she did not speak with an attorney, and there is no evidence that Mr. Fish knew federal sentencing law or spoke with her about it. Moreover, it is clear from the transcript of the resumed interview that S.A. Lynch continued to suggest to the defendant that waiving her rights was necessary in order for her to reduce her sentence:

> But ... again, Ashley, you have to make the decision if you wanna talk to us and ... we have, at the time we talked to you, we had a tremendous amount of information regarding the accident and since that time, we have gotten considerably more information. There's absolutely no doubt and .... you're gonna be convicted in federal court for being the driver of the accident when a death occurred. So again, it, it comes down to ... once that's established, is it gonna be, are you gonna get acceptance of responsibility? Are you g-, are we gonna be able to go to the federal prosecutor and the federal judge and say that you've been cooperative and then you get some benefit for that.

(ECF No. 15-3 at 1.) It was only then that the defendant agreed to waive her rights and answer law enforcement's questions without the advice of counsel. Based on the totality of the circumstances, I conclude that the government has failed to prove by a preponderance of the evidence that her waiver was voluntary. I therefore conclude that her answers to the questions posed to her are not admissible in the government's case in chief. The same follows with respect to her statements made to S.A. Lynch on the afternoon of August 29 when he undertook to explain to the defendant why it was in her interest to waive her rights. Though S.A. Lynch did not intend to question the defendant about the offense until she actually waived her rights, her responses were to the questions he indicated he intended to ask her and were clearly elicited by his explanation. Since she had not waived her rights, her responses to his questions are also inadmissible.

20

**ORDER**

For the reasons set forth above, the defendant's motion to suppress is granted in part and denied in part. The arrest of the defendant was lawful and thus the motion to suppress evidence obtained as a result thereof is denied. The motion is also denied as to the statements made by the defendant to Officer Grignon and S.A. Lynch in the early morning hours of August 29, 2015. The motion is granted as to the statements made to S.A. Lynch and Officer Mahkimetas thereafter.

Dated this __2nd__ day of March, 2016.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court